FIFTH DIVISION 

                                                                                        December 30, 1999                      

No. 1-98-4337 

FIELDCREST BUILDERS, INC.,             ) Appeal from the          

Plaintiff and Appellee and        ) Circuit Court of

Cross-Appellant and               ) Cook County 

     Defendant-Counterdefendant,       )  

                                       )

v.                                )

                                       ) 

GREGORY ANTONUCCI and                  ) 

JENINE ANTONUCCI,                      )

Defendants and Appellants and     )

Cross-Appellees and               ) 

Plaintiffs                        ) 

                                       )

(B and D Custom Homes, Inc., and       )    

 Mayfair Lumber Company,               ) Honorable  

Intervenors and                   ) Clifford L. Meacham, 

     Counterplaintiffs).               ) Judge Presiding. 

JUSTICE GREIMAN delivered the opinion of the court:  

This appeal follows a bench trial of consolidated actions in the mechanics' lien section of the circuit court of Cook County.  The controversies arise out of a construction contract between Fieldcrest Builders, Inc., the general contractor, and Gregory and Jenine Antonucci, the homeowners, for the extensive renovation of and addition to their single-family residence in Glenview, Illinois.  B & D Custom Homes, Inc. (B & D), a carpentry subcontractor, and Mayfair Lumber Company (Mayfair), a material supplier, also asserted mechanics' liens.  

On October 16, 1998, the trial court entered judgment in favor of Fieldcrest on its 
quantum meruit
 count in the amount of $84,148.25, after allowing setoffs for certain claims of 
the Antonuccis.  The trial court also allowed the total lien claim of Mayfair and allowed, in part, the lien claim of B & D.  Later, on January 25, 1999, the trial court ordered the Antonuccis to pay costs ($5,673.28) to Fieldcrest.  The Antonuccis then filed the instant appeal and, in turn, Fieldcrest filed a cross-appeal.  

On direct appeal, the Antonuccis raise five issues as to whether (1) the judgment in favor of the general contractor (Fieldcrest) includes the principal amounts claimed by two subcontractors (B & D and Mayfair); (2) the trial court erroneously failed to deduct from Fieldcrest's judgment the $10,000 paid by the Antonuccis when the construction contract was executed; (3) Fieldcrest's 
quantum meruit
 damages should exclude the amounts attributed to overhead and general conditions; (4) the trial court erred in not awarding certain alleged remedial and delay damages; and (5) the trial court erred in taxing costs against the Antonuccis.  

For all of the reasons that follow, we remand the matter to the circuit court to find whether the amounts claimed by B & D and Mayfair were included within the amount awarded to Fieldcrest and to determine whether it failed to credit the Antonuccis in the amount of $10,000, 
i.e.
, the amount paid at the time the parties entered into the contract.  We affirm the trial court's order relating to the 
damages awarded to Fieldcrest for overhead and general conditions.  We affirm the trial court's decision as to the amount of remedial damages awarded to the Antonuccis and the denial of damages for delay.  We reverse the order awarding costs to the Antonuccis.       

On cross-appeal, Fieldcrest asserts that the trial court erred in denying its claim for a mechanic's lien, failing to award attorney fees under section 17 of the Illinois Mechanic's Lien Act (Act)  (770 ILCS 60/17 (West 1994)), and denying its motion for reconsideration for leave to file an amended complaint against Roxanne Malo, alleging tortious interference with contract.  We affirm all of the trial court's rulings challenged by Fieldcrest. 

In addition, B & D filed a separate brief in this appeal to assert that the Antonuccis waived any issue regarding the validity of the money judgment or mechanic's lien in favor of B & D because the Antonuccis failed to argue the efficacy of B & D's awards in their appellate brief.  In its brief, B & D thoroughly detailed the arguments and issues presented by the Antonuccis on appeal, none of which challenge the efficacy of the awards to B & D.  Accordingly, the Antonuccis have waived the issue on appeal pursuant to Supreme Court Rule 341(e)(7) (177 Ill. 2d R. 341(e)(7)), which mandates that "[p]oints not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." 

From March 1993 through May 1994, the Antonuccis prepared to have extensive renovations done on their home.  Preparations included the hiring of an architect to draw up the plans, the submission of bids by contractors, the modification of the plans to meet the approval of the village, applying for and obtaining building permits from the village, obtaining a construction loan with Harris Bank, and establishing a construction loan escrow trust and disbursing agreement with Chicago Title Insurance Company.  Eventually, on April 2, 1994, the Antonuccis and Fieldcrest entered into a building construction agreement in the amount of $846,978.  The work was to commence in May 1994 and be completed by March 1995.

On May 2, 1994, after vacating their home, the Antonuccis delivered their house to Fieldcrest for commencement of the project.  Throughout the course of the project, problems and concerns developed between Fieldcrest and the Antonuccis.  Ultimately, on August 20, 1994, the Antonuccis gave notice to terminate the contract based upon Fieldcrest's alleged breach of the contract, including substandard construction work, lack of proper insurance and failure to maintain a clean and environmentally safe jobsite.  On August 22, 1994, Fieldcrest ceased work on the project.  Subsequently, the Antonuccis hired another general contractor to complete the project and remediate the allegedly defective work done by Fieldcrest.  

Fieldcrest's position regarding the problems encountered on the project was that the drawings and specifications for the project contained deficiencies, inaccuracies and incomplete areas.  Errors, such as improper dimensions, caused the architect and others to visit the project site on numerous occasions to resolve the problems and resulted in additional labor and time on the part of Fieldcrest.  Fieldcrest also maintained that the deficiencies of the drawings, the delays by the Antonuccis in making certain decisions, and the numerous additional changes made by the Antonuccis increased the costs of the project.  

The Antonuccis maintained that Fieldcrest was to blame for the problems on the project, arguing in general that Fieldcrest's workmanship was poor and its performance was deficient.  In particular, the Antonuccis contended that the original demolition contractor hired by Fieldcrest engaged in disorderly conduct at the site and then abandoned the project without having performed the work; the house was left open and fixtures were stolen; Fieldcrest had no employees and provided no supervision or oversight of the project; questions arose concerning the supervisor's attention to the work as well as the regularity of his presence on the site; job logs to detail the progress of the project on a daily basis were not prepared correctly, were incomplete, or have been lost; the site was filled with debris; and the quality of the work performed by Fieldcrest was woefully inadequate.  The turning point for the Antonuccis came after a rainstorm during the evening of August 12, 1994, causing water damage to the house because Fieldcrest failed to tarp the open portions of the Antonuccis' home.  

The monetary dispute between the parties is premised on the draw requests issued by Fieldcrest to the Antonuccis for progress payments.  There is no dispute as to the content of these draw requests and as to the failure of the Antonuccis to pay the second and third draw requests.  

The first draw request, dated June 28, 1994, was submitted by Fieldcrest for the amount of $122,500.  In July 1994, Chicago Title released funds to Fieldcrest in the amount of $112,500, 
i.e.
, $10,000 less than the bill.  The $10,000 item that was not paid was listed on the first draw request as a charge for "overhead & fee." 

The second draw request, dated August 2, 1994, was never paid by the Antonuccis.  The total amount in the second draw request was $97,463, which included the $10,000 amount left unpaid from the first draw request.  The second draw request included a contractor's sworn statement, itemizing the work performed, the amount due, and the contractor or subcontractor involved.  

The third draw request is dated August 30, 1994, 
i.e.
, 10 days after the Antonuccis terminated their contract.  The total amount of the third draw request was $198,007, representing the amount unpaid from the second draw ($97,463) and the amount attributed to the work subsequent to the second draw ($100,544). The Antonuccis never paid the third draw request.   

In October 1994, the Antonuccis filed a two-count complaint in the law division against Fieldcrest, alleging breach of contract and consumer fraud (case No. 94 L 13633).  In December 1994, Fieldcrest filed its answers, affirmative defenses, and counterclaims to the Antonuccis' complaint.  In this pleading, Fieldcrest asserted two counterclaims, alleging anticipatory breach of contract and seeking relief under 
quantum meruit
.  In its 
quantum meruit
 counterclaim, Fieldcrest alleged that between the period April 2 and August 22, 1994, it provided labor, materials and services in the amount of 
$305,571
, and the Antonuccis had paid only 
$112,500
, leaving a balance of 
$183,071
.
(footnote: 1)  Also in December 1994, Fieldcrest recorded its claim for a mechanic's lien in the amount of $183,071 and filed a complaint in the chancery division to foreclose its recorded mechanic's lien in the amount of $183,071 (case No. 94 CH 11482).

By order dated February 3, 1995, the Antonuccis' complaint at law was consolidated into Fieldcrest's chancery action.  The order further provided  that the cases would proceed in the chancery division. 

In February 1995, the Antonuccis filed their first amended complaint, alleging breach of contract and consumer fraud.  In June 1995, Fieldcrest filed its amended complaint, seeking to foreclose its mechanic's lien. Fieldcrest alleged that Antonuccis owe "$183,071, which includes in excess of $17,000 for extra work performed by Fieldcrest at the request and direction of the Antonuccis, pursuant to the" three draw requests. Fieldcrest stated that it recorded its claim for a lien in the same amount ($183,071).  After reciting the three draw requests, Fieldcrest stated that, to date, the Antonuccis paid $112,500.   

By order dated October 16, 1995, the court renamed the Antonuccis' first amended complaint and exhibits thereto to the Antonuccis' counterclaim.  Fieldcrest, in its answer to the Antonuccis' counterclaim, admitted that the Antonuccis "initially paid Fieldcrest $10,000 as an advance under the parties' contract.  Further answering, however, Fieldcrest states that in a subsequent draw request, the Antonuccis withheld these same funds from payment to Fieldcrest."  

Mayfair recorded a subcontractor's notice and claim for lien against Fieldcrest and the Antonuccis in the amount of $34,388.32, on October 11, 1994.  On January 27, 1995, the court granted Mayfair's petition to intervene in Fieldcrest's chancery action and to file its appearance, answer and counterclaim.  On June 8, 1995, Mayfair filed its amended counterclaim seeking a mechanic's lien on the Antonuccis' premises (count I) and seeking judgment against Fieldcrest in the amount of $34,388.32 (count II).  Mayfair alleged that on June 23, 1994, Fieldcrest entered into an oral contract with Mayfair to furnish and deliver building materials and supplies to the Antonuccis' project and that Mayfair completed its tasks on July 29, 1994.  In its interrogatory answers, filed on December 17, 1996, Mayfair stated that it had not received any payment and alleged a lien in the amount of $34,042.78.  To its answers, Mayfair attached copies of its invoices to Fieldcrest.  

B & D filed a mechanic's lien against Fieldcrest in the amount of $44,158, on November 18, 1994.  On February 6, 1996, the court granted B & D's petition to intervene.  In its answer, affirmative defenses and counterclaim to Fieldcrest's complaint, B & D asserted that on June 15, 1994, Fieldcrest subcontracted with B & D to furnish certain rough carpentry services for the Antonuccis' project for a price of $52,500.  By an additional written change order, B & D's cost increased by $7,780.  B & D performed the terms of its subcontract.  Fieldcrest submitted a sworn contractor's affidavit to the Antonuccis about September 26, 1994, stating that Fieldcrest had subcontracted with B & D for rough labor in the amount of $60,280 and had paid B & D the sum of $16,127.  B & D asserted counterclaims for foreclosure of its mechanic's lien (count I ) and breach of contract (count II).  In its answer, Fieldcrest admitted the contract with B & D and the change order.  Fieldcrest further admitted the sworn contractor's affidavit of September 24, 1994, but observed that it had paid B & D the sum of $16,122, not $16,127.  

In January 1998, concurrent with the bench trial, the court entered judgments in favor of Mayfair and B & D against Fieldcrest only.  Specifically, on January 9, 1998, the court entered judgment in favor of Mayfair against Fieldcrest for the sum of $34,042.78, together with costs, for the purposes of Mayfair's count II of its amended counterclaim.  Later, on January 21, 1998, the trial court entered judgment in favor of B & D against Fieldcrest in the amount of $37,158 on count II of B & D's counterclaim (breach of contract) and reserved ruling on count I against the Antonuccis (mechanic's lien).  

A bench trial commenced on January 7, 1998.  As previously ordered by the court, the Antonuccis' complaint filed in the law division against Fieldcrest was consolidated with Fieldcrest's lien foreclosure action filed in the chancery division.  The trial court ordered that counts I and II of Fieldcrest's counterclaim in the law divisions case (94 L 13633), for anticipatory breach of contract and 
quantum meruit
, would be deemed counts II and III, respectively, of Fieldcrest's amended complaint in the lien foreclosure case (94 CH 11482). 

At trial, the court heard the testimony of numerous witnesses involved in the Antonuccis' project, including: (1) Gregory Antonucci, the homeowner; (2) Steve Page, the architect hired by the Antonuccis; (3) Joseph Dakis, the president and owner of Fieldcrest; (4) Sylvester "Buddy" Neal, the project supervisor retained by Fieldcrest; (5) Kenneth Veach, a nonlicensed engineer; (6) William Zanoni, the president of the insurance company that covered the Antonuccis (Glenview Insurance Agency, Property and Casualty Insurance Company); (7) Anthony Padula, a former plan examiner for the Village of Glenview who was involved in the building permits for the Antonuccis' project; (8) Dennis Lungren, the owner of Distinctive Design Luxury Homes (DDL), a company that worked on the Antonuccis' project after termination of the Fieldcrest contract; (9) Steve Favelli, an employee of Task Force Incorporated, a demolition business that worked on the Antonuccis' project after Fieldcrest left; (10) Hal Olson, the credit manager of Mayfair; (11) Daniel Gibala, the president of B & D; and (12) Bernice Gibala, vice-president of B & D.  In addition, hundreds of exhibits were presented and many were admitted during the course of the trial.  

After trial, the court issued a thoughtful 19-page opinion and order that contained numerous findings of facts, including, in pertinent part, that: (1) on August 12, 1994, water penetrated the property, causing damage; (2) Fieldcrest's conduct gave rise to the right to terminate the contract by the Antonuccis; (3) Fieldcrest breached the contract; (4) Fieldcrest is entitled to the reasonable value of its services less the injury suffered due to the breach; (5) the Antonuccis proved a setoff in the amount of $28,442.75; (6) Fieldcrest was due $84,148.25; (7) B & D proved and is entitled to a lien in the amount of $35,767; and (8) Mayfair proved and is entitled to a lien in the amount of $34,042.78.  The trial court entered judgment as follows: (1) a judgment in the amount of $84,148.25 in favor of Fieldcrest on its 
quantum meruit
 count; (2) a mechanic's lien against the property in the amount of $47,855.75 in favor of Mayfair ($34,042.78 in principal and $13,812.97 in statutory interest, plus costs); and (3) a mechanic's lien against the property in the amount of $49,966.01 in favor of B & D ($35,767 in principal and $14,199.01 in statutory interest, plus costs).  

On appeal, the resolution of the parties' primary disputes  turn on whether the trial court's findings and judgment are against the manifest weight of the evidence.  
E.g.
, 
Midwest Environmental Consulting & Remediation Services, Inc. v. Peoples Bank
, 251 Ill. App. 3d 256, 266-67 (1993); 
Wilmette Partners v. Hamel
, 230 Ill. App. 3d 248, 256 (1992).  "For a judgment to be against the manifest weight of the evidence, an opposite conclusion must be clearly evident."  
Wilmette Partners
, 230 Ill. App. 3d at 256.  

On direct appeal, the Antonuccis first assert that the judgment in favor of Fieldcrest includes the principal amounts claimed by B & D and Mayfair and, thus, the Antonuccis would be paying twice for the same services if they were obligated to pay both Fieldcrest and the two subcontractors' mechanics' liens.  The Antonuccis, referring to the pleadings and record, maintain that Fieldcrest sought recovery for amounts unpaid in the second draw request, which included the entirety of the claims by Mayfair and B & D.  

The general rule provides that a judgment is to be construed like other written instruments with the determinative factor being the intention of the court as gathered from all parts of the judgment itself.  
In re Marriage of Plymale
, 172 Ill. App. 3d 455, 459 (1988).  While an 
unambiguous
 judgment must be enforced as drafted, an 
ambiguous
 judgment can be read in conjunction with the entire record and construed in accordance therewith.  
In re Marriage of Breslow
, 306 Ill. App. 3d 41, 57 (1999).  "A decree must be interpreted in its entirety and should include consideration of other parts of the record, the pleadings and the issues."  
Comet Casualty Co. v. Schneider
, 98 Ill. App. 3d 786, 789 (1981).  

Our consideration of the language of the judgment itself in conjunction with our thorough examination of the record in the present case does not resolve the issue of double payment.  The trial court order clearly established three separate awards for Fieldcrest, Mayfair and B & D, individually.  However, the trial court did not itemize or indicate in its findings what labor and material was included in the $226,123 value attributed to "Fieldcrest and its subcontractors."  The trial court expressly found that "[p]rior to breaching the contract, Fieldcrest and its subcontractors had performed substantial work and supplied significant material.  The value of labor and material supplied is found to be $226,123."  There is no dispute that Mayfair and B & D were Fieldcrest's subcontractors and their work was performed within the time period of the draw requests for which Fieldcrest sought payment.  The trial court order, albeit lengthy and precise, fails to identify the exact source of its finding except that the total value allowed to Fieldcrest 
and its subcontractors
 is $226,123.  Arithmetical contortions from the figures provided in the various  pleadings, exhibits, and other portions of the record do not reveal the source of or equate with the $226,123 figure.  Accordingly, we remand the matter to the trial court to enter a definitive finding as to whether the $226,123 figure includes or excludes the principal amounts claimed by Mayfair and B & D.  

Second, the Antonuccis assert that the trial court inadvertently failed to credit them with a $10,000 payment that was made to Fieldcrest upon execution of the construction contract.  Fieldcrest, however, contends that it credited the $10,000 deposit payment by deleting it from its draw requests.  

The record conclusively reveals that the Antonuccis paid Fieldcrest $10,000, on April 19, 

1994, as earnest money in accordance with the terms of the construction contract.  Even assuming that Fieldcrest indeed credited the Antonuccis for $10,000 in its second draw request, the order of the trial court does not credit the Antonuccis for that amount.  The record affirmatively shows that the amount was paid by the Antonuccis; however, there is no direct reference to it in the trial court order.   Thus, we remand the issue to the trial court for a definitive finding as to the $10,000 credit due to the Antonuccis.  

Third, the Antonuccis assert that the amount of Fieldcrest's 
quantum meruit
 damages should exclude the amount billed for overhead, fees and general conditions contained in the second draw request.  To support its theory that a 
quantum meruit
 award should exclude overhead and handling charges, the Antonuccis primarily rely on this court's decision in 
John Burns Construction Co. v. Interlake, Inc.
, 105 Ill. App. 3d 19 (1982).  The Antonuccis misread the 
Interlake
 case.  

In 
Interlake
, the defendant argued, and this court agreed, that the trial court improperly applied a 
quantum meruit
 measure of damages to the contractor Burns by including "all of Burns' costs on its itemized statement except overhead and handling charges, less what Interlake had already paid."  
Interlake
, 105 Ill. App. 3d at 27.  This court observed that the figure awarded to Burns "did not take into account what amount of Burns' costs were attributable to Burns' own construction errors. *** The court merely deleted Burns' handling and overhead charges and declined to add prejudgment interest."  
Interlake
, 127 Ill. App. 3d at 27-28.  This court vacated the award and "remanded for a hearing to ascertain the value of Burns' work.  The value of that work should not include the costs, if any, necessitated by 
Burns' own negligent acts or omissions."  
Interlake
, 105 Ill. App. 3d at 28.  Thus, this court held that the trial court erred in failing to take into account the costs that were occasioned by Burns' own negligence but did not 
find that handling and overhead charges must be excluded, as a matter of law, in the measure of damages. 

Under a theory of 
quantum meruit
, the measure of recovery is the reasonable value of the plaintiff's services.  
Evans & Associates, Inc. v. Dyer
, 246 Ill. App. 3d 231, 242 (1993); 
Mor-

Wood Contractors, Inc. v. Ottinger
, 205 Ill. App. 3d 132, 143 (1990).  We may not reverse a trial court's finding as to the reasonable value of plaintiff's services unless the finding is manifestly erroneous.  
Mor-Wood Contractors
, 205 Ill. App. 3d at 144.  Given the lack of any affirmative showing to the contrary in the record and the lack of any case law holding that such fees cannot be included in the award, we hold that the trial court's finding as to the reasonable value of Fieldcrest's services is not manifestly erroneous.  

Fourth, the Antonuccis assert that the failure of the trial court to award damages for allegedly remedial work done by DDL ($24,016) and for delay in completion of the project (approximately $3,561 in hotel and relocation expenses) was against the manifest weight of the evidence and constitutes reversible error.  We disagree.  

The measure of damages is a question of fact to be decided by the trier of fact.  
Meade v. Kubinski
, 277 Ill. App. 3d 1014, 1018 (1996); 
Oakleaf  v. Oakleaf & Associates, Inc.
, 173 Ill. App. 3d 637, 647 (1988).  On review, this court will not reverse a trial court's findings of damages unless its findings are against the manifest weight of the evidence.  
C-B Realty & Trading Corp. v. Chicago & North Western Ry. Co.
, 289 Ill. App. 3d 892, 901 (1997); 
Meade
, 277 Ill. App. 3d at 1018.  "To uphold a contention that a damage award is contrary to the manifest weight of the evidence, it must be found that the trial court ignored the evidence or that its measure of damages was erroneous as a matter of law."  
Meade
, 277 Ill. App. 3d at 1018.  

Regarding remedial damages, "[i]t is well settled in Illinois that the measure of damages for a breach of contract when a builder has provided less than full performance or has provided defective performance is generally the cost of correcting the defective condition."  
Arch of Illinois, Inc. v. S.K. George Painting Contractors, Inc.
, 288 Ill. App. 3d 1080, 1082 (1997); 
J.R. Sinnott Carpentry, Inc. v. Phillips
, 110 Ill. App. 3d 632, 639 (1982).  

In addition, a homeowner also may be entitled to recover damages for delay in the construction of a residence.  
Ambrose v. Biggs
, 156 Ill. App. 3d 515, 519 (1987).  In particular, a party seeking damages in a case of 
mutual
 delay, as is arguably present here, must "prove the amount of delay, the amount of damages attributable to that delay [citation], and that those delays were caused by the other party separate from any damages that may have resulted from the acts of the claimant."  
Premier Electrical Construction Co. v. American National Bank
, 276 Ill. App. 3d 816, 832 (1995).   

The party seeking the damages bears the burden of establishing the proof of the alleged damages with reasonable certainty.  
Premier Electrical
, 276 Ill. App. 3d at 832 (regarding delay damages); 
Brewer v. Custom Builders Corp.
, 42 Ill. App. 3d 668, 677-78 (1976) (regarding defective workmanship).  

In the present case, the trial court most certainly did not ignore the evidence presented by the Antonuccis for the purposes of claiming remedial and delay damages.  

As to damages for remedial work, the trial court awarded the Antonuccis a setoff in the amount of $25,942.75 for the work performed by Task Force.  Beyond the setoff for the charges of Task Force, however, the trial court found that the Antonuccis' "proof is inadequate to determine which costs incurred by the Antonuccis reflect correction of Fieldcrest's defective work and which costs relate to completion of the original work.  Failure to separate these costs renders the evidence incompetent to establish damages for this element."  The primary proof offered by the Antonuccis to demonstrate additional remedial damages for the work performed by DDL was through the testimony of Dennis Lungren, the owner of DDL and the person who prepared a list of alleged remedial work.  Lungren's testimony essentially revealed that he did not know what tasks performed by DDL were remedial in nature as distinguished from new jobs.  We find that the trial court's finding on remedial damages is not against the manifest weight of the evidence. 

As to the alleged delay damages, paragraph 45 of the trial court's findings states, in pertinent part, that "[t]he Antonuccis have not proved the delay damages asserted in their amended counterclaim. ***  Moreover, there is evidence of delays occurring during the time Gregory Antonucci and/or Malo served as general contractors and Page was construction manager."  The record includes evidence that the Antonuccis caused delays in Fieldcrest's work during the course of the project and the Antonuccis made no attempt to separate, explain or identify what delays could be attributed to Fieldcrest.  Furthermore, we reject the Antonuccis' argument that the project was delayed when they terminated Fieldcrest from the project in August and were unable to find a replacement until December.  Neither the Antonuccis nor independent research provides any legal authority to support the Antonuccis' position that delay damages are mandated, as a matter of law, where the homeowner terminates the general contractor.  Thus, we hold that the trial court's finding that the Antonuccis did not sufficiently prove delay damages is not manifestly erroneous.  

Fifth, the Antonuccis assert that the trial court erred in granting, in part, Fieldcrest's bill of costs against the Antonuccis in the amount of $5,6673.28.  Fieldcrest, however, contends that it is entitled to costs as the prevailing party as to its 
quantum meruit
 count.  We find that Fieldcrest should not be awarded any costs because it cannot be considered a prevailing party.  Where the two parties "both won and lost on claims in the proceedings below," neither party "can be said to have been the prevailing party."  
Brown & Kerr, Inc. v. American Stores Properties, Inc.
, 306 Ill. App. 3d 1023, 1034 (1999).   Thus, we reverse the award of costs entered against the Antonuccis. 

   On cross-appeal, Fieldcrest asserts that the trial court erred, as a matter of law, in extinguishing its mechanic's lien, notwithstanding the trial court's findings that Fieldcrest breached the contract, did not substantially perform the contract and failed to perform in a workmanlike manner.  As acknowledged by the parties at oral argument, there is no case law directly on point to resolve this issue. 

In its conclusions of law, the trial court held that "[a] party must show substantial performance to enforce a lien" and  "[g]iven that Fieldcrest has been found to have breached the contract, said lien may not be foreclosed, and is herewith ordered extinguished and held for naught."  We agree.  

The long-established precept provides that mechanics' liens are created purely by statute and are in derogation of the common law.  
Koester v. Huron Development Co.
, 25 Ill. 2d 337, 340 (1962), citing 
North Side Sash & Door Co. v. Hecht
, 295 Ill. 515, 519 (1920), and 
Cronin v. Tatge
, 281 Ill. 336, 337 (1917).  "The purpose of the Act is to permit a lien upon premises where a benefit has been received by the owner and where the value or condition of the property has been increased or improved by reason of the furnishing of labor and materials."  
R.W. Dunteman Co. v. C/G Enterprises, Inc.
, 181 Ill. 2d 153, 164 (1998).  Accordingly, the Act provides special empowerment to one party to a contract, 
i.e.
, a contractor.  See 
Contract Development Corp. v. Beck
, 255 Ill. App. 3d 660, 669 (1994) (the Act provides extraordinary remedies to certain classes of contractors and subcontractors). 

The special remedy afforded to contractors under the Act is in addition to ordinary common law remedies for the enforcement of the contract out of which the lien arises.  
Midwest Environmental Consulting & Remediation Services
, 251 Ill. App. 3d at 259, citing 
Hoier v. Kaplan
, 313 Ill. 448, 455-56 (1924),  and 
West v. Flemming
, 18 Ill. 248 (1857).  "The remedy provided by the Act may be pursued concurrently or successively with the common law remedies until satisfaction of the claim is obtained through one of them."  
Delaney Electric Co. v. Schiessle
, 235 Ill. App. 3d 258, 265 (1992).  

The burden is on the lien claimant to prove every element necessary to establish the lien.  
Delaney Electric
, 235 Ill. App. 3d at 265.  To bring a contractor's lien claim, four prerequisites are recognized: (1) a valid contract; (2) with the owner of the property or someone with proper authority for the owner; (3) for the furnishing of services or materials; and (4) performance of the contract or a valid excuse for nonperformance.  
Delaney Electric
, 235 Ill. App. 3d at 264.  For the purpose of the present appeal, the fourth factor is determinative.  

Normally under the Act, the contractor must completely perform the contract to enforce its lien for the value of what has been done.  
E.g.
, 
Contract Development Corp.
, 255 Ill. App. 3d at 666.  Non performance on the part of the contractor, however, is excused where the owner breaches the contract and, therefore, the contractor would still be entitled to enforce its lien for the value of the services and material provided in performance of the contract.   
Wilmette Partners
, 230 Ill. App. 3d at 261 (and cases cited therein); 770 ILCS 60/4 (West 1994).  In the present case, however, the trial court found that Fieldcrest, not the owner, breached the contract.  

Notwithstanding the general rule, a contractor still can enforce a mechanic's lien by proving that he substantially performed the contract in a workmanlike manner.  
Evans & Associates, Inc. v. Dyer
, 246 Ill. App. 3d 231, 239 (1993); 
Mani Electrical Contractors v. Kioutas
, 243 Ill. App. 3d 662, 668 (1993); 
Folk v. Central National Bank & Trust Co.
, 210 Ill. App. 3d 43, 46 (1990).  The burden is on the contractor to establish substantial performance.  
Evans & Associates
, 246 Ill. App. 3d at 239.  

Where substantial performance of a contract in a workmanlike manner is established, a contractor is entitled to enforce his mechanic's lien for the amount attributed to the work furnished under the contract, subject to any deductions by way of setoff for completing and correcting the work.  
Mani Electrical Contractors
, 243 Ill. App. 3d 662 (upheld contractor's action to foreclose mechanic's lien where the trial court found that he had substantially completed the contract in a workmanlike manner). 

"When a builder does not substantially perform under a contract, he is limited to claiming damages under a theory of 
quantum meruit
.  These damages are equal to the reasonable value of his services minus the amount of damages suffered by the buyers."  
Evans & Associates
, 246 Ill. App. 3d at 242 (reversed the judgment for the contractor on its mechanics' liens claims and remanded for the trial court to consider damages under 
quantum meruit
); 
Folk
, 210 Ill. App. 3d at 47 (concluded that the contractor had not substantially performed its contract and its workmanship was of poor quality). 

It would be inconsistent with the language of the Act, the attendant legal principles, and the holdings in the judicial opinions to entitle a contractor to a mechanic's lien where he did not substantially perform the contract in a workmanlike manner and, indeed, was found to have breached the contract.  In light of these facts, we hold that a contractor is not entitled to a mechanic's lien and is limited to recovery in 
quantum meruit
 only.  

Next, Fieldcrest asserts that it is entitled to recover its attorney fees under section 17 of the Act (770 ILCS 60/17 (West 1994)).  In light of our holding that Fieldcrest is not entitled to a mechanic's lien under the Act, this issue is moot.  

Lastly, Fieldcrest asserts that the trial court abused its discretion in denying its motion for reconsideration for leave to file an amended complaint against Roxanne Malo to allege a cause of action for tortious interference with an existing contractual relationship.  

A trial court's ruling to deny leave to file an amended complaint is a matter of discretion and will not be reversed absent an abuse of discretion.  
Board of Directors of Bloomfield Club Recreation Ass'n v. Hoffman Group, Inc.
, 186 Ill. 2d 419, 432 (1999).  To determine whether the trial court's denial of a party's motion to amend constituted an abuse of discretion, four factors are considered: (1) whether the proposed amendment would cure the defective pleading; (2) whether the proposed amendment would surprise or prejudice the opposing party; (3) whether the proposed amendment was timely filed; and (4) whether the moving party had previous opportunities to amend.  
Hoffman Group
, 186 Ill. 2d at 432.  The court may consider the ultimate efficacy of the claim.  
Hirsch v. Feuer
, 299 Ill. App. 3d 1076, 1087 (1998); 
Wilk v. 1951 W. Dickens, Ltd.
, 297 Ill. App. 3d 258, 265 (1998) (concluded that the circuit court did not abuse its discretion in denying the plaintiff leave to file its amended complaint where the first factor was dispositive because the allegations in the proposed complaint did not establish a cognizable claim).

The elements required to state a cause of action for tortious interference with contract are (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contractual relationship between the plaintiff and another; (3) the defendant's intentional and unjustifiable inducement of a breach of the contract; (4) a breach of contract by the other caused by the defendant's wrongful acts; and (5) damage to the plaintiff 
Grund v. Donegan
, 298 Ill. App. 3d 1034, 1038 (1998); 
Ray Dancer, Inc. v. DMC Corp.
, 230 Ill. App. 3d 40, 48 (1992).  

In its order denying Fieldcrest's motion to reconsider and for leave to file an amended complaint, the trial court, in its conclusions of law, stated that "[t]he finding that Fieldcrest breached makes proof of the element impossible as to the Antonuccis."  We agree with the trial court.  A required element of this tort is that the defendant (in this case, Malo) engaged in wrongful conduct, causing the other party to the contract (here, the Antonuccis) to breach the contract with the plaintiff (here, Fieldcrest).  Failing to satisfy the breach element of the tort necessarily would defeat Fieldcrest's action against Malo.  See 
Hirsch
, 299 Ill. App. 3d at 1087 (the court can consider the ultimate efficacy of the claim).  Accordingly, the trial court did not abuse its discretion in denying Fieldcrest's motion for  leave to amend its complaint against Malo.  

The dissent chronicles all of the alleged conduct of Ms. Malo, but does not do so with reference to the allegations of the proposed amended complaint which Fieldcrest sought to file.  Further,  even if the trial court erred in denying the motion to file the amended complaint, it does not follow that the trial court's findings as to fact and law relating to the non-performance of Fieldcrest and the imposition of a mechanic's lien ought to be set aside.   The dissent does not address the specific findings of the trial court that Fieldcrest failed to perform its obligations under the contract.  The trial court was well aware of Ms. Malo's activities in connection with the project and made specific findings regarding the same.   Instead of giving the appropriate deference to the trial court, the dissent engages in speculation that all of the problems between the parties can be laid at Ms. Malo's doorstep.

For all of the foregoing reasons, we affirm in part, reverse in part and remand the matter to the trial court. 

Affirmed in part and reversed in part; cause remanded. 

QUINN, J., concurs.

HARTMAN, J., dissents.        

JUSTICE HARTMAN dissents:

The record in this case compels this dissent from the majority decision, for the reasons that follow.

The record reveals that the undertaking of demolition and construction services by Fieldcrest for the Antonuccis was troubled, difficult, badly investigated and poorly planned by the Antonuccis and their consultants, 
ab initio.
  No fewer than three plan sets were required before this project ever got off the ground and, even then, numerous modifications to the plans had to be prepared. There were deficiencies in the drawings prepared by the Antonuccis' architects and engineers, including missing and inaccurate dimensions, concerns over structural supports for which Antonuccis' people gave Fieldcrest inaccurate information and,  for a significant period of time, inattention by the Antonuccis to owner-selection responsibilities. One of the structural people working for the Antonuccis on engineering specifications and drawings was not even licensed to do the work he purported to do, and which had to be re-done by Fieldcrest, and yet the Antonuccis relied upon his opinions with regard to alleged construction defects.  In addition, the Antonuccis obligated themselves to secure insurance coverage, some of which might have covered part of the losses experienced by the Antonuccis, which the latter failed to procure. These were the foundations of the ongoing problems, obstacles and causes of delay facing Fieldcrest as it embarked and worked upon the project.

In addition, the record demonstrates the continuing interference, in practically every phase of the demolition and construction process, by Malo to the extent that the circuit judge was forced to concede in his conclusions of law: 

"She was not a mere bystander, friend, financier, and facilitator. She was in fact intimately involved as agent, as bid solicitor, as bank, as a party who entered contracts, as one who directed bank action, prepared contractor statements, and received and transmitted funds. On the trial record, her involvement exceeded that of either Antonucci. Had she been more truthful about the nature and extent of her role, she may have avoided the extent of her participation. Having chosen to mislead plaintiff and the Court, her complaints [about the unfairness of the action against her] ... all ring hollow. She has 

herself to blame."

Having thus concluded, the court nevertheless finds that Fieldcrest was not entitled to plead intentional interference by Malo,  inducing or causing a breach or termination of the relationship or expectancy because Fieldcrest breached the contract.  (Conclusion of  law no. 17.)

   That Fieldcrest sought discovery with respect to making Malo a third party defendant throughout this protracted litigation, and was obstructed from doing so until nearly the end of the trial  proceedings, is fully borne out by the record.  Lack of diligence in seeking third party defendant status for Malo was not attributable solely to Fieldcrest, which should have been allowed to do so under section 735 ILCS 5/2-616.  Fieldcrest was entitled to attempt proof of its theory, that its breach of any material aspect of the contract with the  Antonuccis, if any, was caused by the conduct of Malo, and Antonucci under Malo's direction and control.

Malo's alleged conduct, of which Fieldcrest complained, was not just run-of-the-mill petty annoyances, but serious obstruction and intervention. For example, after the Antonuccis entered into a construction loan trust and disbursing agreement with Chicago Title & Trust Co., and closed their construction loan with Harris Bank of Glencoe, Fieldcrest submitted to the Antonuccis draw request #1, for which the Antonuccis swore completeness of the work to July 16, 1994 and Fieldcrest was credited with the requested amount. Structural problems thereafter developed, based upon improper assumptions made by Antonuccis' experts.  Unforeseen structural supports had to be placed by Fieldcrest, which representatives of Harris Bank inspected and found "consistent with the draw request," and noted further that "extensive demolition of the existing structure has been completed at this point [and] framing and concrete work for new portions of the building have begun." There were no objections by the Antonuccis to this finding. Nevertheless, Malo claiming to represent Antonuccis' interests instructed the Harris bank to withhold $10,000 from the first draw, which Fieldcrest claims represented the Antonuccis' earnest money deposit required under the contract.

 Fieldcrest submitted its draw request #2. The Harris Bank funded this draw request and wire transferred the money at Antonucci's direction; however, this draw request was never paid when Malo specifically instructed the bank not to release the funds to Fieldcrest. Malo thereafter entered the jobsite and presented Fieldcrest with yet additional architectural drawings, calling for complete redesign of the first two sheets of drawings with respect to the front entry, revisions to window heights and structural steel supports for the entire front entry.

Thereafter, Malo met with Dakis of Fieldcrest and Antonucci on August 20, 1994, who sought to have Fieldcrest sign an agreement to terminate the construction and demolition contract, which Fieldcrest refused to do. Antonucci on that date then unilaterally terminated the contract, although Fieldcrest sought to finish its obligations under the agreement. The contract provided that the Antonuccis would have the right to terminate the contract if Fieldcrest failed to complete the work satisfactorily prior to March 1, 1995. The Antonuccis submitted no evidence that Fieldcrest could not have met the March 1 completion date.

 Significantly, the village of Glenview never cited the project for any violations or fines, nor did it shut down the job or issue stop work orders. No complaints or other claims of problems appear in the village building department files.

Malo allegedly was not through with the project. She thereupon instructed the bank that the second draw submitted by Fieldcrest was not to be honored, purportedly acting on behalf of the Antonuccis. She further notified the bank that the Fieldcrest contract was being terminated unilaterally by the Antonuccis and that arbitration "is being sought with litigation probably being pursued as a means of remedy."  Malo then advised the bank that "Roxanne Malo will, with the assistance of the architect, act as the general contractor until such time as a contract may be signed with a new builder to correct the structural deficiencies and complete the project."

Fieldcrest's draw request #3 was submitted thereafter for the balance due and owing from the Antonuccis, which also was not honored. There was evidence that Malo, either individually, or doing business as Concepts by Mauro, entered into subcontracts as agent or on behalf of Antonucci to complete work on the project with seven different companies or suppliers. Further, she was alleged to have received direct payments from draws #2 and #3, exceeding amounts paid by her to subcontractors. 

It is clear from the foregoing that considerable ventilation of the allegations should be undertaken at a trial on the issues raised in the proposed third party complaint.

Accordingly, I dissent from the disposition presented by the majority and would reverse the denial of Fieldcrest's motion for reconsideration and leave to file an amended complaint against Malo which, if sustained by further evidence, could well affect the decision to deny the mechanic's lien to which Fieldcrest appears to be entitled, as well as appropriate relief against Malo.

FOOTNOTES
1: We recognize that $305,571 minus $112,500 is $193,071, not $183,071.  The figures stated above, however, are the figures stated in Fieldcrest's pleading.